1   XAVIER BECERRA
    Attorney General of California
2   MARGARITA PADILLA
    Supervising Deputy Attorney General
3   REED SATO
    Deputy Attorney General
4   State Bar No. 87685
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 210-7789
     Fax: (916) 327-2319
7    E-mail: reed.sato@doj.ca.gov
    *Attorneys for Plaintiff*
8   *California Department of Toxic Substances Control*

9           IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12          SAN FRANCISCO/OAKLAND DIVISION

13

| | |
|---|---|
| 14  CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, | CASE NO. |
| 15 | |
| 16              Plaintiff, | **COMPLAINT FOR RECOVERY OF RESPONSE COSTS and DECLARATORY RELIEF** |
| 17       v. | |
| 18  DEE M. McLEMORE TRUST, CHERYL PLATO McLEMORE, in her individual and representative capacities, JOHN McKENNA, in his representative capacity, JAMES TODD RUSSELL, in his representative capacity, HARD CHROME ENGINEERING, INC., | [42 U.S.C. §§ 9607(a), 9613(b) and (g)(2)] |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23              Defendants. | |

24      Plaintiff, the California Department of Toxic Substances Control (the

25  Department), alleges as follows:

26                    **STATEMENT OF THE ACTION**

27      1.    The Department files this civil action under section 107(a) of the

28  Comprehensive Environmental Response, Compensation, and Liability Act

                                                    1

1    (CERCLA), 42 U.S.C. § 9607(a), for the recovery of response costs and interest on

2    such response costs that the Department has incurred, and will incur, in connection

3    with releases and threatened releases of hazardous substances, including cadmium,

4    chromium, hexavalent chromium, and lead, at and/or originating from the Hard

5    Chrome Engineering real property, as further described herein.

6         2.    Hard Chrome Engineering, Inc., ("HCE") operated a metal and

7    chromium plating business in Oakland, California.  HCE operated on a 0.64-acre

8    parcel with street addresses of 750 and 764 107th Avenue in Oakland, Alameda

9    County, California, and identified in county property records as Assessor's Parcel

10   Number 45-5251-5-2 (the Hard Chrome Engineering real property).  The Hard

11   Chrome Engineering real property, and the areal extent of the hazardous substances

12   contamination, including contamination of surface, subsurface areas, and

13   groundwater, that is, or has been, present at, beneath, and/or from the Hard Chrome

14   Engineering real property, is referred to herein as "the Site."

15        3.    The Department further makes a claim for declaratory relief, under 28

16   U.S.C. § 2201 and section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), for a

17   declaratory judgment that each of the Defendants is jointly and severally liable to

18   the Department for response costs it has incurred and will incur in responding to

19   releases and threatened releases of hazardous substances at and/or from the Site.

20                                  **JURISDICTION**

21        4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §

22   1331, and section 113(b) of CERCLA, 42 U.S.C. § 9613(b).

23                                      **VENUE**

24        5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and

25   section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the release or threatened

26   release of hazardous substances that gives rise to these claims occurred in this

27   district.

28

                                            2         Complaint for Recovery of Response
                                                      Costs and Declaratory Relief

**INTRA-DISTRICT ASSIGNMENT**

6.     Assignment to the San Francisco/Oakland Division is proper under Civil Local Rule 3-2(d) because a substantial part of the events or omissions giving rise to the claims in this action occurred in Alameda County in the State of California.

**PLAINTIFF**

7.     The Department is a public agency of the State of California, organized and existing under California Health and Safety Code section 58000 et seq. The Department has authority under state law to determine whether there has been a release and/or threatened release of a hazardous substance into the environment and to respond to releases and/or threatened releases of a hazardous substance into the environment. The Department may bring suit under sections 107(a) of CERCLA, 42 U.S.C. § 9607(a), for recovery of response costs and under 28 U.S.C. § 2201 and section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), for declaratory relief.

**DEFENDANTS**

8.     Defendant Dee M. McLemore Trust (the Trust) is the current owner of the real property that constitutes the Hard Chrome Engineering real property. The Trust has been the owner of the Hard Chrome Engineering real property since approximately November 1988. The Trust has been the owner of the Hard Chrome Engineering real property during the time period when there were disposals of hazardous substances onto that real property.

9.     Defendant Cheryl Plato McLemore is a current co-trustee of the Trust and is sued in her representative capacity. As co-trustee, she is the current owner of the real property that constitutes the Hard Chrome Engineering real property. As a co-trustee, she also was an owner during the time period when HCE operated at the Hard Chrome Engineering real property and when disposals of hazardous substances at and from the Hard Chrome Engineering real property to the

Complaint for Recovery of Response
Costs and Declaratory Relief

1   environment occurred.  Defendant Cheryl Plato McLemore is also the beneficiary

2   of the Trust; and in that capacity, she benefits from the activities of the Trust.

3   Defendant Cheryl Plato McLemore is liable for the claims in this complaint in her

4   representative and individual capacities.

5       10.   Defendant John McKenna is a current co-trustee of the Trust and is

6   sued in his representative capacity.  As co-trustee, he is the current owner of the

7   Hard Chrome Engineering real property.

8       11.   Defendant James Todd Russell was a co-trustee of the Trust between

9   approximately October 6, 1992, to about August 7, 2006, and is sued in his

10  representative capacity.  As a co-trustee, he was the owner of the Hard Chrome

11  Engineering real property during the time period when there were disposals of

12  hazardous substances at and from the Site as a result of the operations of HCE on

13  the Hard Chrome Engineering real property.

14      12.   Defendant HCE is a suspended California corporation.  HCE operated

15  its business at the Hard Chrome Engineering real property from approximately

16  November 1, 1972, until about March 31, 2005.  As a result of HCE's operations on

17  the Hard Chrome Engineering real property, hazardous substances disposed of from

18  the HCE's operations were released into the environment.

19                          **GENERAL ALLEGATIONS**

20      13.   From approximately 1972 until 2005, HCE operated a metal and

21  chromium plating business at the Hard Chrome Engineering real property.

22  Ownership of the Hard Chrome Engineering real property was transferred to the

23  Trust on or around 1987.  The period of operation of HCE included the time period

24  during which the Hard Chrome Engineering real property was owned by the Trust

25  and certain of the named individuals were co-trustees.

26      14.   HCE's metal and chromium plating and machining services operations

27  included the use of cleaning baths for machine parts, mechanical stripping by

28  sandblasting and grinding, and plating baths that used chromic and sulfuric acid.

4                          Complaint for Recovery of Response
                           Costs and Declaratory Relief

1    Other chemicals used during operations included sodium nitrate, potassium

2    chromate, triethylamine, kerosene, argon, carbon dioxide, acetylene, oxygen,

3    hydrochloric acid, chromic oxide, chromic acid, sulfuric acid and sodium

4    carbonate.

5         15.    The Department is informed and believes and thereon alleges that

6    during HCE's operations at the Hard Chrome Engineering real property, including

7    the time period that the Hard Chrome Engineering real property was owned by the

8    Trust, HCE generated approximately fifty pounds of hazardous substances per

9    month.

10        16.    The Department is informed and believes and thereon alleges that at

11   various times during HCE's operations at the Hard Chrome Engineering real

12   property, HCE disposed of and/or released hazardous substances directly onto the

13   ground at the Hard Chrome Engineering real property.

14        17.    In addition, the Department is informed and believes and thereon

15   alleges that during HCE's operations at the Hard Chrome Engineering real

16   property, HCE utilized an exhaust hood that emitted fumes or particulate chromium

17   and metals.  Those hazardous substance emissions were deposited to the ground on

18   and around the Hard Chrome Engineering real property.

19        18.    In March 2005, the Department issued an Imminent and Substantial

20   Endangerment Determination and Consent Order ("I&SE Order") to the Trust

21   pursuant to the Department's authority under California Health & Safety Code §

22   25358.3.  The I&SE Order required the Trust to investigate and remediate the

23   release of hazardous substances by HCE at and from the Hard Chrome real

24   property.  The I&SE Order is attached hereto as Exhibit "A" and incorporated

25   herein by reference.

26        19.    The contaminants of concern ("COCs") at the Site are cadmium, total

27   chromium, hexavalent chromium, lead, total petroleum hydrocarbons as diesel-

28   range organics, and total petroleum hydrocarbons as motor oil-range organics. The

5          Complaint for Recovery of Response
           Costs and Declaratory Relief

soil contaminated with these COCs appears to be a continuing source of hexavalent chromium to groundwater under and around the Site.

20.     After undertaking some remedial action required by the I&SE Order, the Trust, through co-trustee Cheryl Plato McLemore, notified the Department on or around June 30, 2008, that the Trust could no longer comply with the I&SE Order allegedly due to insufficient assets in the Trust.

21.     After the Trust stopped performing response actions, the Department took over the investigation and remediation of the Site in 2008.

22.     On or around March 12, 2012, the Department approved a Removal Action Workplan (RAW) for the Site in which it selected a remedy.  This was a "remedial action" as defined by 42 U.S.C. § 9601(24). The remedy consisted of the excavation of two on-site sumps and soil contaminated by hazardous substances, including chromium contaminated soil.  The remedy also included in-situ injections to treat chromium in the groundwater under and around the Site.

23.     On or around March 4, 2013, the Department initiated physical on-site construction of the remedy for the Site.

24.     All phases of the RAW have been completed by the Department and a completion report was approved by the Department on or around May 4, 2015.

25.     In September, 2015, an addendum was made to the RAW for the Site to include supplemental groundwater injections and additional groundwater sampling.  By approximately April, 2016, the supplemental groundwater injections were completed.

26.     The Department may consider the imposition of a land use covenant to restrict the use of the groundwater impacted by the Site as part of a final remedy for the Site.

27.     The Department has incurred, and expects to continue to incur, costs of "response" as that term is defined in CERCLA section 101(25), 42 U.S.C. § 9601(25) in taking actions at, or related to, the contamination by hazardous

6

Complaint for Recovery of Response
Costs and Declaratory Relief

substances at and from the Site.  The response actions include, but are not limited to, the following activities:

     a.  Issuing orders to one or more responsible parties requiring response actions at and around the Site;

     b.  Reviewing sampling and analysis;

     c.  Performing inspections and preparing reports;

     d.  Reviewing work plans for investigation and remediation;

     e.  Conducting Site visits and overseeing field work;

     f.  Providing a public comment period;

     g.  Contacting potentially responsible parties;

     h.  Taking actions to address the requirements of the California Environmental Quality Act; and

     i.  Preparing and implementing the final RAW.

28.    The Department's unpaid response costs related to the Site through September 30, 2018, total approximately $2,459,409, exclusive of interest.  The Department expects to incur additional response costs.

**FIRST CLAIM FOR RELIEF**

(Claim for Recovery of Response Costs

Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a))

(Against All Defendants)

29.    The Department re-alleges and incorporates by reference the allegations of the preceding paragraphs 1 through 28 as though fully set forth herein.

30.    The Site is a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

31.    Each of the Defendants, is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

Complaint for Recovery of Response
Costs and Declaratory Relief

1      32.    The Department is a "State" for purposes of recovery of response costs

2 under section 107(a) of CERCLA, 42 U.S.C. § 9607(a).  Pursuant to this section,

3 the Department may also recover interest on response costs incurred.

4      33.    The Trust is an "owner and operator" of a facility, as those terms are

5 used in CERCLA section 107(a)(1), 42 U.S.C. § 9607(a)(1).

6      34.    The Trust also "owned or operated" a facility at the time of disposal of

7 a hazardous substance, as those terms are used in section 107(a)(2) of CERCLA, 42

8 U.S.C. § 9607(a)(2).

9      35.    Cheryl Plato McLemore and John McKenna, as the current co-trustees

10 of the Trust, are each an "owner and operator" of a facility, as those terms are used

11 in CERCLA section 107(a)(1), 42 U.S.C. §9607(a)(1) and are liable for the

12 response costs incurred by DTSC in their representative capacities.  Cheryl Plato

13 McLemore and James Todd Russell, each "owned or operated" a facility at the time

14 of disposal of a hazardous substance, as those terms are used in section 107(a)(2) of

15 CERCLA, 42 U.S.C. § 9607(a)(2), and are liable in their representative capacities.

16 Cheryl Plato McLemore and James Todd Russell, as co-trustees, each had the

17 power to control the use of trust property which included the Hard Chrome

18 Engineering real property, and while they were co-trustees of the Trust, the Hard

19 Chrome Engineering real property was used by HCE for the hazardous substance

20 disposal activities which resulted in or contributed to the releases of hazardous

21 substances at the Site.

22      36.    HCE "owned or operated" a facility at the time of disposal of a

23 hazardous substance, as that term is used in section 107(a)(2) of CERCLA, 42

24 U.S.C. § 9607(a)(2) and is liable for the response costs incurred by the Department

25      37.    The disposal of the contaminants of concern at the Site are "releases"

26 of hazardous substances into the environment from a facility within the meaning of

27 section 101(22) of CERCLA, 42 U.S.C. § 9601 (22).

28

Complaint for Recovery of Response
Costs and Declaratory Relief

38.     As a result of the disposal of hazardous substances, and/or the release and/or threatened release of hazardous substances at and from the Site, the Department has responded to the release or threatened release of hazardous substances to the environment and incurred response costs, including the costs of oversight and enforcement costs, within the meaning of section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

39.     The Department has incurred costs in responding to the release or threatened release of hazardous substances at and from the Site in a manner that satisfies the requirements of section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4), in that the costs arose from activities that are not, and have not been, inconsistent with the applicable requirements of the National Contingency Plan, 40 C.F.R. Part 300.

40.     Each of the Defendants is jointly and severally liable, without regard to fault, pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for the response costs that the Department incurred in response to the release or threatened release of hazardous substances at or from the Site.

**SECOND CLAIM FOR RELIEF**

(Claim for Declaratory Relief Pursuant to Section 113(g)(2) of CERCLA)

(Against All Defendants)

41.     The Department re-alleges and incorporates by reference the allegations of the preceding paragraphs 1 through 40 as though fully set forth herein.

42.     The Department has incurred and expects to continue to incur response costs related to the Site.

43.     Under section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the Department is entitled to a declaratory judgment that the Defendants are each jointly and severally liable, without regard to fault, in any subsequent action or actions by the Department to recover any further costs incurred in response to the

Complaint for Recovery of Response
Costs and Declaratory Relief

1   release and/or threatened release of hazardous substances into the environment at or

2   from the Site.

3                              **PRAYER FOR RELIEF**

4   WHEREFORE, the Department prays for relief as follows:

5       A.      For a judgment that each Defendant is jointly and severally liable

6   without regard to fault to the Department under section 107(a) of CERCLA, 42

7   U.S.C. § 9607(a) for all response costs incurred by the Department as a result of the

8   release and threatened release of hazardous substances from the Site, in an amount

9   to be proven at trial but of at least $ 2,459,409;

10      B.      For interest on the above sums as provided under section 107(a) of

11  CERCLA, 42 U.S.C. § 9607(a) in an amount to be determined;

12      C.      For a declaratory judgment that each Defendant is jointly and severally

13  liable without regard to fault to the Department under section 113(g)(2) of

14  CERCLA, 42 U.S.C. § 9613(g)(2) for all future response costs incurred by the

15  Department as a result of the release and threatened release of hazardous substances

16  at and/or from the Site;

17      D.      For enforcement costs, including costs of this suit and attorneys' fees as

18  additional response costs pursuant to section 107(a) of CERCLA, 42 U.S.C. §

19  9607(a); and

20      E.      For all other relief the Court deems just and appropriate.

21

22

23

24

25

26

27

28

Complaint for Recovery of Response
        Costs and Declaratory Relief

1  Dated:  February 27, 2019                Respectfully submitted,

2                                           XAVIER BECERRA
                                            Attorney General of California
3                                           MARGARITA PADILLA
                                            Supervising Deputy Attorney General
4
                                            /s/ Reed Sato
5

6                                           REED SATO
                                            Deputy Attorney General
7                                           *Attorneys for Plaintiff*
                                            *California Department of Toxic Substances*
8                                           *Control*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Recovery of Response
                                                                  Costs and Declaratory Relief

Exhibit A

**STATE OF CALIFORNIA**
**CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY**
**DEPARTMENT OF TOXIC SUBSTANCES CONTROL**


In the Matter of:                  )        Docket No. HSA-CO 04/05-090
                                   )
                                   )
Hard Chrome Engineering            )
750 107 th Avenue                  )
Oakland, California  94603 )        IMMINENT AND SUBSTANTIAL
                                   )              ENDANGERMENT DETERMINATION
                                   )              AND CONSENT ORDER
Respondent:              )
Dee M. McLemore Trust              )
147 East Liberty Street            )
Reno, Nevada 89501                 )
                                   )        Health and Safety Code
                                   )        Sections 25355.5(a)(1)(B) and (C),
                                   )        25358.3(a), 58009 and 58010
                                   )

## I. INTRODUCTION

1.1 <u>Parties</u>.  The California Environmental Protection Agency, Department of Toxic Substances Control (DTSC), and Dee M. McLemore Trust (Trust); a Nevada Corporation doing business in California (Respondent) hereby enter into this Consent Order (Order) and agree to its terms and conditions.  DTSC and Respondent are referred to collectively herein as the Parties.

1.2 <u>Property/Site</u>.  This Order applies to the property located at 750 107 th Avenue, Oakland, Alameda County, California 94603.  The property is identified by Assessor's parcel number 45-5251-5-2.  A map showing the property is attached as Exhibit A.  This Order applies to the property and the areal extent of contamination that resulted from activities on the property (hereinafter, the "Site").

1.3 <u>Jurisdiction</u>.  This Order is entered into by the parties pursuant to Health and Safety Code sections 25358.3(a), 25355.5(a)(1)(B) and (C), 58009 and 58010.  Health and Safety Code section 25358.3(a) authorizes DTSC to take various actions, including issuance of an Imminent or Substantial Endangerment Determination and Order, when DTSC determines that there may be an imminent or substantial endangerment to the public health or welfare or to the environment, because of a release or a threatened release of a hazardous substance.

Health and Safety Code section 25355.5(a)(1)(B) authorizes DTSC to issue an

1

order establishing a schedule for removing or remedying a release of a hazardous substance at a site, or for correcting the conditions that threaten the release of a hazardous substance.  The order may include, but is not limited to requiring specific dates by which the nature and extent of a release shall be determined and the site adequately characterized, a remedial action plan prepared and submitted to DTSC for approval, and a removal or remedial action completed.

Health and Safety Code section 25355.5(a)(1)(C) authorizes DTSC to enter into an enforceable agreement with a responsible party for the site which requires the party to take necessary corrective action to remove the threat of the release, or to determine the nature and extent of the release and adequately characterize the site, prepare a remedial action plan, and complete the necessary removal or remedial actions, as required in the approved remedial action plan.

Health and Safety Code section 58009 authorizes DTSC to commence and maintain all proper and necessary actions and proceedings to enforce its rules and regulations; to enjoin and abate nuisances related to matters within its jurisdiction which are dangerous to health; to compel the performance of any act specifically enjoined upon any person, officer, or board, by any law of this state relating to matters within its jurisdiction; and/or on matters within its jurisdiction, to protect and preserve the public health.

Health and Safety Code section 58010 authorizes DTSC to abate public nuisances related to matters within its jurisdiction.

## II.   FINDINGS OF FACT

DTSC hereby finds:

2.1   <u>Liability of Respondent.</u>  Respondent is a responsible party or liable person as defined in Health and Safety Code section 25323.5.  Dee M. McLemore Trust has owned the Site since 1972.  Hard Chrome Engineering has operated at the Site since 1972 and is also a responsible party or liable person as defined in Health and Safety Code section 25323.5.

2.2   <u>Physical Description of Site</u>.  The Site occupies approximately 27,500 square feet in a mixed commercial and residential area of Oakland.  The Site is bounded to the north, east and west by residences.  The Site is secured by building walls and a drum storage area is secured by fencing.

2.3   <u>Site History</u>. The Trust has owned the property since 1972.  Hard Chrome Engineering has leased the property from the Trust since 1972.  According to the Trust's response to a DTSC Information Request, the property was used as a moving storage facility and a manufacturing facility for producing urethane molding products prior to 1972.
Hard Chrome Engineering provides plating and machining services.  The plating process utilizes a solution of chromic acid in plating baths.  In addition to chromic acid,

chemicals used in the plating operations include sulfuric acid (used in a part cleaning bath), and soda ash (used in a caustic cleaning bath).  A petroleum naphtha fluid is used in metal machining operations following plating.  The majority of stripping is performed by a mechanical process and only occasionally hydrochloric acid is used.  Hard Chrome Engineering's June 9, 2000 Hazardous Materials Business Plan includes the following constituents in its chemical inventory:  sodium nitrate, potassium chromate, triethylamine, kerosene, argon, carbon dioxide, acetylene, oxygen, hydrochloric acid, chromic oxide, chromic acid, sulfuric acid and sodium carbonate.

    2.4  <u>Hazardous Substances Found at the Site</u>.

    2.4.1  In August 1991, the Trust conducted a Phase II Environmental Assessment.  One soil sample and four groundwater samples were collected for laboratory analysis.  Total chromium and cyanide were detected in groundwater at concentrations up to 180.3 milligrams per liter (mg/l) and 0.103 mg/l, respectively.  Total chromium was detected in groundwater at concentrations exceeding the State Maximum Contaminant Level (MCL) of 0.050 mg/l.

    2.4.2  In June 1992, the Trust conducted a Preliminary Environmental Characterization that consisted of a site inspection, an interview with the facility manager, and collection and chemical analysis of soil and groundwater samples.  Soil samples were collected from three test borings and the borings were converted to groundwater monitoring wells.  The borings were located in the plating area, machine shop area, and east of a concrete sump built into the floor of the plating area.  Several metals were detected in groundwater at concentrations exceeding MCLs.  These metals included chromium (total chromium at 700 mg/l and hexavalent chromium at 680 mg/l), arsenic (0.30 mg/l), and selenium (0.17 mg/l).  The State MCLs for arsenic and selenium are 0.050 mg/l and 0.010 mg/l, respectively.  The report for this investigation concluded that the chrome plating operation was the source of the chromium detected in groundwater.

    2.4.3  In 1997, the Trust conducted a soil and groundwater investigation.  The investigation consisted of drilling twelve exploratory soil borings, collection of groundwater grab samples from six of the borings, and conversion of four of the borings to groundwater monitoring wells.  The borings were located around and beyond the perimeter of the sump in the plating area to define the extent of chromium impact to Site soil and groundwater.  Several metals were detected in groundwater at concentrations exceeding State MCLs.  These metals included beryllium, total chromium, and selenium, which were detected at concentrations up to 0.032 mg/l, 3,000 mg/l, and 0.14 mg/l, respectively.  The State MCL for beryllium is 0.004 mg/l.

2.4.4 The Trust has been performing semi-annual groundwater monitoring at the Site and submitting reports to the Regional Water Quality Control Board, San Francisco Bay Region, since April 2000.  Metals detected in groundwater at concentrations exceeding State MCLs during the March 2003 sampling event include antimony (0.092 to 1.2 mg/l) and chromium (0.066 to 530 mg/l).  The State MCL for antimony is 0.006 mg/l.

2.5  Health Effects.

2.5.1  Chromium.  Chromium can be found in the environment in several forms which include trivalent and hexavalent chromium.  Trivalent chromium occurs naturally in the environment and is an essential nutrient required by the human body to promote the action of insulin in body tissues so that sugar, protein, and fat can be used by the body.  Hexavalent chromium is produced by industrial processes, is generally not naturally-occurring, and is more toxic than trivalent chromium.  Swallowing large amounts of hexavalent chromium can cause stomach upsets and ulcers, convulsion, kidney and liver damage, and even death (Toxicological Profile for Chromium, U.S. Department of Health and Human Services, September 2000).  Hexavalent chromium is listed under Proposition 65 as a chemical that is known to cause cancer.

2.5.2  Antimony.  Drinking water with large concentrations of antimony can cause diarrhea, joint and/or muscle pain, vomiting, anemia and heart problems. (Toxicological Profile for Antimony, U.S. Department of Health and Human Services, December 1992)

2.6  Routes of Exposure.  Human exposure could occur through direct contact with contaminated soil and shallow groundwater if excavation in connection with utility maintenance, repair or installation or building activities are performed on the Site.  Groundwater is not currently used as a water supply source in the immediate vicinity of the Site.  However, exposure could occur through ingestion or direct contact with groundwater that is pumped in the future.

2.7  Public Health and/or Environmental Risk.  There is one drinking water well within one to two miles upgradient from the Site that is primarily used as a residential backup supply.  The Site is within an area that the Regional Water Quality Control Board, San Francisco Bay Region, has identified as being a moderate to significant deep drinking water resource and shallow groundwater as being a potential source of drinking water.

## III.  CONCLUSIONS OF LAW

3.1  Respondent and Hard Chrome Engineering are a responsible party as defined by Health and Safety Code section 25323.5.

3.2  Each of the substances listed in Section 2.4 is a "hazardous substance" as defined in Health and Safety Code section 25316.

4

3.3  There has been a "release" and/or there is a "threatened release" of hazardous substances listed in Section 2.4 at the Site, as defined in Health and Safety Code section 25320.

3.4  The actual and threatened release of hazardous substances at the Site may present an imminent and substantial endangerment to the public health or welfare or to the environment.

3.5  Response action is necessary to abate a public nuisance and/or to protect and preserve the public health.

## IV.  DETERMINATION

4.1 Based on the foregoing findings of fact and conclusions of law, DTSC hereby determines that response action is necessary at the Site because there has been a release and/or there is a threatened release of a hazardous substance.

4.2  Based on the foregoing findings of fact and conclusions of law, DTSC hereby determines that there may be an imminent and/or substantial endangerment to the public health or welfare or to the environment because of the release and/or the threatened release of the hazardous substances at the Site.

## V.  CONSENT ORDER

Based on the foregoing, IT IS HEREBY AGREED AND ORDERED THAT THE Respondent conducts the following response actions in the manner specified herein, and in accordance with a schedule specified by DTSC as follows:

5.1  All response actions taken pursuant to this Order shall be consistent with the requirements of Chapter 6.8 (commencing with section 25300), Division 20 of the Health and Safety Code and any other applicable state or federal statutes and regulations.

5.1.1  Removal Actions.   Respondent shall undertake removal actions if, DTSC determines that they are necessary to mitigate the release of hazardous substances at or emanating from the Site.  DTSC may require Respondent to submit a removal action workplan that includes a schedule for implementing the workplan for DTSC's approval. Either DTSC or Respondent may identify the need for removal actions.

5.1.2  Groundwater Monitoring.  Respondent shall continue the ongoing semi-annual groundwater monitoring that is currently being conducted at the Site. Respondent shall prepare a groundwater sampling plan that outlines the procedures that will be followed in conducting groundwater sampling.  The groundwater sampling plan shall be submitted to DTSC within 45 days of the effective date of the Order.

Subsequent monitoring shall be conducted until DTSC determines it is appropriate to terminate monitoring.

5.2  <u>Interim Screening and Evaluation of Remedial Technologies</u>.   Respondent shall submit an interim document within 30 days of the effective date of the Order that shall include:

(a)  A summary of the results of Site investigations.

(b)  A presentation of the conceptual site model identifying contamination sources and potential exposure pathways and receptors.

(c)  An evaluation of potentially suitable remedial technologies and recommendations for treatability studies.

(d)  Preliminary cost estimates for potential site removal and remedial actions.

5.3  <u>Treatability Studies</u>.  Treatability testing will be performed by Respondent to develop data for the detailed removal or remedial alternatives.  Treatability testing is required to demonstrate the implementability and effectiveness of technologies, unless Respondent can show DTSC that similar data or documentation or information exists. The required deliverables are a workplan, a sampling and analysis plan, and a treatability evaluation report.

5.4  <u>Removal Action Workplan (RAW)</u>.  Respondent will prepare a RAW if the preliminary cost estimates prepared as part of the Interim Screening and Evaluation of Remedial Technologies indicate the cost of Site cleanup will be below one million dollars and if DTSC determines a removal action is appropriate.  Respondent will prepare the RAW in accordance with Health and Safety Code sections 25323.1 and 25356.1.  The Removal Action Workplan will include:

(a)  A description of the onsite contamination;

(b)  The goals to be achieved by the removal action;

(c)  An analysis of the alternative options considered and rejected and the basis for that rejection.  This should include a discussion for each alternative which covers its effectiveness, implementability and cost;

(d)  Administrative record list;

(e)  A description of the techniques and methods to be used in the removal action, including any excavating, storing, handling, transporting, treating, and disposing of material on or off the site;

(f)  Sampling and Analysis Plan with corresponding Quality Assurance Plan to confirm the effectiveness of the RAW, if applicable;

(g)  A brief overall description of methods that will be employed during the removal action to ensure the health and safety of workers and the public during the removal action.  A detailed community air monitoring plan shall be included if requested by DTSC.

In conjunction with DTSC, Respondent shall implement the public review process specified in DTSC's Public Participation Policy and Guidance Manual.  DTSC will prepare a response to the public comments received. If required, the Respondent shall submit within two weeks of the request the information necessary for DTSC to prepare this document.

Following DTSC's finalization of the Responsiveness Summary, DTSC will specify any changes to be made in the RAW.  Respondent shall modify the document in accordance with DTSC's specifications and submit a final RAW within 15 days of receipt of DTSC's comments.

If the proposed removal action does not meet the requirements of Health and Safety Code section 25356.1(h), the Respondent will perform a Baseline Health and Ecological Risk Assessment, conduct a Feasibility Study, prepare a Remedial Action Plan (RAP), and prepare a Remedial Design as outlined in Sections 5.6, 5.7, 5.8, and 5.9.

5.6  <u>Baseline Health and Ecological Risk Assessment</u>.  If applicable, Respondent shall conduct health and ecological risk assessments for the Site that meet the requirements of Health and Safety Code §25356.1.5(b).  Respondent shall submit a Baseline Health and Ecological Risk Assessment Report within 30 days from DTSC's approval of the Interim Screening and Evaluation of Remedial Technologies.  The report shall be prepared consistent with U.S. EPA and DTSC guidance and regulations, including as a minimum:  Risk Assessment Guidance for Superfund, Volume 1; Human Health Evaluation Manual, December 1989; Superfund Exposure Assessment Manual, April 1988; Risk Assessment Guidance for Superfund, Volume 2, Environmental Evaluation Manual, March 1989;  Supplemental Guidance for Human Health Multimedia Risk Assessments of Hazardous Waste Sites and Permitted Facilities (DTSC, September 1993); and all other related or relevant policies, practices and guidelines of the California Environmental Protection Agency and policies, practices and guidelines developed by U.S.EPA pursuant to 40 CFR 300.400 et seq.  The Baseline Health and Ecological Risk Assessment Report shall include the following components:

(a)  Contaminant Identification.  Characterization data shall identify contaminants

of concern for the risk assessment process.

(b)  Environmental Evaluation.  An ecological assessment consisting of:

(1)  Identification of sensitive environments and rare, threatened, or endangered species and their habitats; and

(2)  As appropriate, ecological investigations to assess the actual or potential effects on the environment and/or develop remediation criteria.

(c)  Exposure Assessment.  The objectives of an exposure assessment are to identify actual or potential exposure pathways, to characterize the potentially exposed populations, and to determine the extent of the exposure.  Exposed populations may include industrial workers, residents, and subgroups that comprise a meaningful portion of the general population, including, but not limited to, infants, children, pregnant women, the elderly, individuals with a history of serious illness, or other subpopulations, that are identifiable as being at greater risk of adverse health effects due to exposure to hazardous substances than the general population.

(d)  Toxicity Assessment.  Respondent shall evaluate the types of adverse health or environmental effects associated with individual and multiple chemical exposures; the relationship between magnitude of exposures and adverse effects; and related uncertainties such as the weight of evidence for a chemical's potential carcinogenicity in humans.

(e)  Risk Characterization.  Risk characterization shall include the potential risks of adverse health or environmental effects for each of the exposure scenarios derived in the exposure assessment.

5.7  Feasibility Study (FS).  If applicable, a FS shall be conducted for the Site. The FS shall be prepared consistent with the U.S. Environmental Protection Agency's "Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA," October 1988.  The purpose of the FS is to evaluate alternatives to the extent necessary to select a remedy appropriate for the Site.  An FS Report shall be prepared and submitted by Respondent to DTSC for review and approval, no later than 30 days from approval of the Baseline Health and Ecological Risk Assessment.  The FS Report shall summarize the results of the FS including the following:

(a)  Documentation of all treatability studies conducted.

(b)  Development of medium specific remedial action objectives, including legal requirements and other promulgated standards that are relevant.
(c)  Identification and screening of general response actions, remedial technologies, and process options on a medium and/or operable unit specific basis.

(d)  Evaluation of alternatives based on the criteria contained in the National Contingency Plan (NCP) (40 Code of Federal Regulations (CFR) Part 300) including:

Threshold Criteria:

(1)  Overall protection of human health and the environment.

(2)  Compliance with legal requirements and other promulgated standards that are relevant.

Primary Balancing Criteria:

(1)  Long-term effectiveness and permanence.

(2)  Reduction of toxicity, mobility, or volume through treatment.

(3)  Short-term effectiveness.

(4)  Implementability based on technical and administrative feasibility.

(5)  Cost.

Modifying Criteria:

(1)  State and local agency acceptance.

(2)  Community acceptance.

(e)  Proposed remedial actions.

5.8  Remedial Action Plan (RAP).  If applicable, no later than 30 days after DTSC approval of the FS Report, Respondent shall prepare and submit to DTSC a draft RAP. The draft RAP shall be consistent with the NCP and Health and Safety Code section 25356.1.  The draft RAP public review process may be combined with that of any other documents required by CEQA.  The draft RAP shall be based on and summarize the approved FS Reports, and shall clearly set forth:

(a)  Health and safety risks posed by the conditions at the Site.

(b)  The effect of contamination or pollution levels upon present, future, and probable beneficial uses of contaminated, polluted, or threatened resources.

(c)  The effect of alternative remedial action measures on the reasonable availability of groundwater resources for present, future, and probable beneficial uses.

(d)  Site-specific characteristics, including the potential for offsite migration of hazardous substances, the surface or subsurface soil, and the hydrogeologic conditions, as well as preexisting background contamination levels.

(e)  Cost-effectiveness of alternative remedial action measures.  Land disposal shall not be deemed the most cost-effective measure merely on the basis of lower short-term cost.

(f)  The potential environmental impacts of alternative remedial action measures, including, but not limited to, land disposal of the untreated hazardous substances as opposed to treatment of the hazardous substances to remove or reduce their volume, toxicity, or mobility prior to disposal.

(g)  A statement of reasons setting forth the basis for the removal and remedial actions selected.  The statement shall include an evaluation of each proposed alternative submitted and evaluate the consistency of the removal and remedial actions proposed by the plan with the NCP.

(h)  A schedule for implementation of all proposed removal and remedial actions.

In conjunction with DTSC, Respondent shall implement the public review process specified in DTSC's Public Participation Policy and Guidance Manual.  Within 10 days of closure of the public comment period, Respondent shall submit to DTSC a written Responsiveness Summary of all written and oral comments presented and received during the public comment period.

Following DTSC's review and finalization of the Responsiveness Summary, DTSC will specify any changes to be made in the RAP.  Respondent shall modify the document in accordance with DTSC's specifications and submit a final RAP within 15 days of receipt of DTSC's comments.

5.9  <u>Remedial Design (RD)</u>.   If applicable, within 60 days after DTSC approval of the final RAP, Respondent shall submit to DTSC for review and approval a RD describing in detail the technical and operational plans for implementation of the final RAP, which includes the following elements, as applicable:

(a)  Design criteria, process unit and pipe sizing calculations, process diagrams, and final plans and specifications for facilities to be constructed.

(b)  Description of equipment used to excavate, handle, and transport contaminated material.

(c)  A field sampling and laboratory analysis plan addressing sampling during implementation and to confirm achievement of the performance objectives of the RAP.

(d)  A transportation plan identifying routes of travel and final destination of wastes generated and disposed.

(e)  For groundwater extraction systems:  aquifer test results, capture zone calculations, specifications for extraction and performance monitoring wells, and a plan to demonstrate that capture is achieved.

(f)  An updated health and safety plan addressing the implementation activities.

(g)  Identification of any necessary permits and agreements.

(h)  An operation and maintenance plan including any required monitoring.

(i)  A detailed schedule for implementation of the remedial action consistent with the schedule contained in the approved RAP including procurement, mobilization, construction phasing, sampling, facility startup, and testing.

5.10  <u>Public Participation Plan (Community Relations)</u>.  Respondent shall work cooperatively with DTSC in providing an opportunity for meaningful public participation in response actions.  Any such public participation activities shall be conducted in accordance with Health and Safety Code sections 25356.1 and 25358.7 and DTSC's most current Public Participation Policy and Guidance Manual, and shall be subject to DTSC's review and approval.

Respondent, in coordination with DTSC, shall conduct a baseline community survey and develop a Public Participation Plan (PPP) which describes how, under this Order, the public and adjoining community will be kept informed of activities conducted at the Site and how  Respondent will be responding to inquiries from concerned citizens.  Major steps in developing a PPP are as follows:

(a)  Develop proposed list of interviewees;

(b)  Schedule and conduct community interviews; and

(c)  Analyze interview notes, and develop objectives.

Respondent shall conduct the baseline community survey and submit the PPP

for DTSC's review within 40 days of the effective date of this Order

Respondent shall implement any of the public participation support activities identified in the PPP, at the request of DTSC.  DTSC retains the right to implement any of these activities independently.  These activities include, but are not limited to, development and distribution of fact sheets; public meeting preparations; and development and placement of public notices.

5.11  California Environmental Quality Act (CEQA).  DTSC must comply with CEQA insofar as activities required by this Order are projects requiring CEQA compliance.  Upon DTSC request, Respondent shall submit any information deemed necessary by DTSC to facilitate compliance with CEQA.  The costs incurred by DTSC in complying with CEQA are response costs and Respondent shall reimburse DTSC for such costs pursuant to Section 6.17.

5.12  Land Use Covenant.  If the approved remedy in the final RAP or final RAW includes deed restrictions or land use restrictions, pursuant to California Code of Regulations, Title 22, section 67391.1, the current owner of the Site shall sign and record the deed restrictions or land use restrictions approved by DTSC within 90 days of DTSC's approval of the final RAP or final RAW.

5.13  Implementation of Final RAP or Final RAW.  Upon DTSC approval of the RD or final RAW, Respondent shall implement the final RAP or final RAW in accordance with the approved schedule in the RD or final RAW.  Within 30 days of completion of field activities, Respondent shall submit an Implementation Report documenting the implementation of the final RAP and RD or final RAW.

5.14  Operation and Maintenance (O&M).  Respondent shall comply with all O&M requirements in accordance with the final RAP and approved RD or final RAW. Within 30 days of the date of DTSC's request, Respondent shall prepare and submit to DTSC for approval an O&M workplan that includes an implementation schedule.  Respondent shall implement the workplan in accordance with the approved schedule.  Respondent shall enter into an O&M Agreement, including financial assurance pursuant to California Health and Safety Code section 25355.2, with DTSC within 30 days of the date of DTSC's request.

5.15  Five-Year Review.  Respondent shall review and reevaluate the remedial action after a period of not more than five years from the completion of construction and startup, and at least every five years thereafter.  The review and reevaluation shall be conducted to determine if human health and the environment are being protected by the remedial action.  Within 30 calendar days before the end of the time period approved by DTSC to review and reevaluate the remedial action, Respondent shall submit a remedial action review workplan to DTSC for review and approval.  Within 60 days of DTSC's approval of the workplan, Respondent shall implement the workplan and shall submit a comprehensive report of the results of the remedial action review.  The report shall describe the results of all sample analyses, tests and other data generated or

received by Respondent and evaluate the adequacy of the implemented remedy in protecting public health, safety and the environment.  As a result of any review performed under this Section, Respondent may be required to perform additional work or to modify work previously performed.

5.16  <u>Changes during Implementation of the Final RAP or Final RAW</u>.  During the implementation of the final RAP and RD or final RAW, DTSC may specify such additions, modifications, and revisions to the RD or final RAW as DTSC deems necessary to protect public health and safety or the environment or to implement the final RAP or final RAW.

5.17  <u>Stop Work Order</u>.  In the event that DTSC determines that any activity (whether or not pursued in compliance with this Order) may pose an imminent or substantial endangerment to the health or safety of people on the Site or in the surrounding area or to the environment, DTSC may order Respondent to stop further implementation of this Order for such period of time needed to abate the endangerment.  In the event that DTSC determines that any site activities (whether or not pursued in compliance with this Order) are proceeding without DTSC authorization, DTSC may order Respondent to stop further implementation of this Order or activity for such period of time needed to obtain DTSC authorization, if such authorization is appropriate.  Any deadline in this Order directly affected by a Stop Work Order, under this Section, shall be extended for the term of the Stop Work Order.

5.18  <u>Emergency Response Action/Notification</u>.  In the event of any action or occurrence (such as a fire, earthquake, explosion, or human exposure to hazardous substances caused by the release or threatened release of a hazardous substance) during the course of this Order, Respondent shall immediately take all appropriate action to prevent, abate, or minimize such emergency, release, or immediate threat of release and shall immediately notify the Project Manager.  Respondent shall take such action in consultation with the Project Manager and in accordance with all applicable provisions of this Order.  Within seven days of the onset of such an event, Respondent shall furnish a report to DTSC, signed by Respondent's Project Coordinator, setting forth the events which occurred and the measures taken in the response thereto.  In the event that Respondent fails to take appropriate response and DTSC takes the action instead, Respondent shall be liable to DTSC for all costs of the response action.  Nothing in this Section shall be deemed to limit any other notification requirement to which Respondent may be subject.

5.19  <u>Discontinuation of Remedial Technology</u>.  Any remedial technology employed in implementation of the final RAP or final RAW shall be left in place and operated by Respondent until and except to the extent that DTSC authorizes Respondent in writing to discontinue, move or modify some or all of the remedial technology because Respondent has met the criteria specified in the final RAP or final RAW for its discontinuance, or because the modifications would better achieve the goals of the final RAP or final RAW.

5.20  Financial Assurance. Respondent shall demonstrate to DTSC and maintain financial assurance for operation and maintenance and monitoring.  Respondent shall demonstrate financial assurance prior to the time that operation and maintenance activities are initiated and shall maintain it throughout the period of time necessary to complete all required operation and maintenance activities.  The financial assurance mechanisms shall meet the requirements of Health and Safety Code section 25355.2. All financial assurance mechanisms are subject to the review and approval of DTSC.

## VI.  GENERAL PROVISIONS

6.1  Project Coordinator.  Within 10 days from the date this Order is signed by DTSC, Respondent shall submit to DTSC in writing the name, address, and telephone number of a Project Coordinator whose responsibilities will be to receive all notices, comments, approvals, and other communications from  DTSC.  Respondent shall promptly notify DTSC of any change in the identity of the Project Coordinator. Respondent shall obtain approval from DTSC before the new Project Coordinator performs any work under this Order.

6.2  Project Engineer/Geologist.  The work performed pursuant to this Order shall be under the direction and supervision of a qualified professional engineer or a professional geologist in the State of California, with expertise in hazardous substance site cleanups.  Within 15 calendar days from the date this Order is signed by DTSC, Respondent must submit:  a) The name and address of the project engineer or geologist chosen by Respondent; and b) in order to demonstrate expertise in hazardous substance cleanup, the resumé of the engineer or geologist, and the statement of qualifications of the consulting firm responsible for the work.  Respondent shall promptly notify DTSC of any change in the identity of the Project Engineer/Geologist. Respondent shall obtain approval from DTSC before the new Project Engineer/Geologist performs any work under this Order.

6.3  Monthly Summary Reports.  Within 30 days from the date this Order is signed by DTSC, and on a monthly basis thereafter, Respondent shall submit a Monthly Summary Report of its activities under the provisions of this Order.  The report shall be received by DTSC by the 15th day of each month and shall describe:

(a)  Specific actions taken by or on behalf of Respondent during the previous calendar month;

(b)  Actions expected to be undertaken during the current calendar month;

(c)  All planned activities for the next month;

(d)  Any requirements under this Order that were not completed;

(e)  Any problems or anticipated problems in complying with this Order; and

14

(f)  All results of sample analyses, tests, and other data generated under this Order during the previous calendar month, and any significant findings from these data.

6.4  <u>Quality Assurance/Quality Control (QA/QC)</u>.  All sampling and analysis conducted by Respondent under this Order shall be performed in accordance with QA/QC procedures submitted by Respondent and approved by DTSC pursuant to this Order.

6.5  <u>Submittals</u>.  All submittals and notifications from Respondent required by this Order shall be sent to:

> Barbara J. Cook, Chief
> Northern California-Coastal Cleanup
>   Operations Branch
> Department of Toxic Substances Control
> 700 Heinz Avenue, Suite 200
> Berkeley, California 94710
> Attention: Claude Jemison

6.6  <u>Communications</u>.  All approvals and decisions of DTSC made regarding submittals and notifications will be communicated to Respondent in writing by the DTSC Northern California Coastal Cleanup Operations Branch Chief or his/her designee.  No informal advice, guidance, suggestions or comments by DTSC regarding reports, plans, specifications, schedules or any other writings by Respondent shall be construed to relieve Respondent of the obligation to obtain such formal approvals as may be required.

6.7  <u>DTSC Review and Approval</u>.  (a) All response actions taken pursuant to this Order shall be subject to the approval of DTSC.  Respondent shall submit all deliverables required by this Order to DTSC.  Once the deliverables are approved by DTSC, they shall be deemed incorporated into, and where applicable, enforceable under this Order.

(b)  If DTSC determines that any report, plan, schedule or other document submitted for approval pursuant to this Order fails to comply with this Order or fails to protect public health or safety or the environment, DTSC may:

(1)  Modify the document as deemed necessary and approve the document as modified; or

15

(2)  Return comments to Respondent with recommended changes and a date by which Respondent must submit to DTSC a revised document incorporating the recommended changes.

(c)  Any modifications, comments or other directives issued pursuant to (b) above, are incorporated into this Order.  Any noncompliance with these modifications or directives shall be deemed a failure or refusal to comply with this Order.

6.8  <u>Compliance with Applicable Laws</u>.  Nothing in this Order shall relieve Respondent from complying with all other applicable laws and regulations, including but not limited to compliance with all applicable waste discharge requirements issued by the State Water Resources Control Board or a California Regional Water Quality Control Board.  Respondent shall conform all actions required by this Order to all applicable federal, state and local laws and regulations.

6.9  <u>Respondent Liabilities</u>.  Nothing in this Order shall constitute or be construed as a satisfaction or release from liability for any conditions or claims arising as a result of past, current or future operations of Respondent.  Nothing in this Order is intended or shall be construed to limit the rights of any of the parties with respect to claims arising out of or relating to the deposit or disposal at any other location of substances removed from the Site.  Nothing in this Order is intended or shall be construed to limit or preclude DTSC from taking any action authorized by law to protect public health or safety or the environment and recovering the cost thereof.  Notwithstanding compliance with the terms of this Order, Respondent may be required to take further actions as are necessary to protect public health and the environment.

6.10  <u>Site Access</u>.  Access to the Site and laboratories used for analyses of samples under this Order shall be provided at all reasonable times to employees, contractors, and consultants of DTSC.  Nothing in this Section is intended or shall be construed to limit in any way the right of entry or inspection that DTSC or any other agency may otherwise have by operation of any law.  DTSC and its authorized representatives shall have the authority to enter and move freely about all property at the Site at all reasonable times for purposes including, but not limited to:  inspecting records, operating logs, sampling and analytic data, and contracts relating to this Site; reviewing the progress of Respondent in carrying out the terms of this Order; conducting such tests as DTSC may deem necessary; and verifying the data submitted to DTSC by Respondent.

To the extent the Site or any other property to which access is required for the implementation of this Order is owned or controlled by persons other than Respondent, Respondent shall use best efforts to secure from such persons access for Respondent, as well as DTSC, its representatives, and contractors, as necessary to effectuate this Order.  To the extent that Respondent's tenants control any portion of the Site, Respondent shall use best efforts to secure from such tenants, access for Respondent as well as for DTSC, its representatives, and contractors, as necessary to effectuate

16

this Order.  For purposes of this Section, "best efforts" includes the payment of reasonable sums of money in consideration of access.  If any access required to complete the Work is not obtained within 45 days of the effective date of this Order, or within 45 days of the date DTSC notifies Respondent in writing that additional access beyond that previously secured is necessary, Respondent shall promptly notify DTSC, and shall include in that notification a summary of the steps Respondent has taken to attempt to obtain access.  DTSC may, as it deems appropriate, assist Respondent in obtaining access.  Respondent shall reimburse DTSC in obtaining access, including, but not limited to, attorneys fees and the amount of just compensation.

6.11  <u>Sampling, Data and Document Availability</u>.  Respondent shall permit DTSC and its authorized representatives to inspect and copy all sampling, testing, monitoring or other data generated by Respondent or on Respondent's behalf in any way pertaining to work undertaken pursuant to this Order.  Respondent shall submit all such data upon the request of DTSC.  Copies shall be provided within seven days of receipt of DTSC's written request.  Respondent shall inform DTSC at least seven days in advance of all field sampling under this Order, and shall allow DTSC and its authorized representatives to take duplicates of any samples collected by Respondent pursuant to this Order.  Respondent shall maintain a central depository of the data, reports, and other documents prepared pursuant to this Order.

6.12 <u>Record Retention</u>.  Respondent shall preserve all such data, reports and other documents for a minimum of ten years after the conclusion of all activities under this Order.  If DTSC requests that some or all of these documents be preserved for a longer period of time, Respondent shall either comply with that request or deliver the documents to DTSC, or permit DTSC to copy the documents prior to destruction. Respondent shall notify DTSC in writing, at least six months prior to destroying any documents prepared pursuant to this Order.

6.13  <u>Government Liabilities</u>.  The State of California shall not be liable for any injuries or damages to persons or property resulting from acts or omissions by Respondent, or related parties specified in Section 6.23, Parties Bound, in carrying out activities pursuant to this Order, nor shall the State of California be held as party to any contract entered into by Respondent or their agents in carrying out activities pursuant to this Order.

6.14  <u>Additional Actions</u>.  By issuance of this Order, DTSC does not waive the right to take any further actions authorized by law.

6.15  <u>Extension Requests</u>.  If Respondent is unable to perform any activity or submit any document within the time required under this Order, Respondent may, prior to expiration of the time, request an extension of the time in writing.  The extension request shall include a justification for the delay.  All such requests shall be in advance of the date on which the activity or document is due.

6.16  <u>Extension Approvals</u>.  If DTSC determines that good cause exists for an extension, it will grant the request and specify a new schedule in writing.  Respondent

17

shall comply with the new schedule incorporated in this Order.

    6.17  <u>Liability for and Payment of Costs</u>.  DTSC may bill Respondent for costs incurred in taking response actions at the Site prior to the effective date of this Order. DTSC will bill Respondent quarterly for its response costs incurred after the effective date of this Order.  Respondent shall pay DTSC within 60 days of receipt of any DTSC billing.  Any billing not paid within 60 days is subject to interest calculated from the date of the billing pursuant to Health and Safety Code section 25360.1.  All payments made by Respondent pursuant to this Order shall be by cashier's or certified check made payable to "DTSC," and shall bear on the face the project code of the Site (Site 201529-00) and the Docket number of this Order.  Payments shall be sent to:

        Department of Toxic Substances Control
        Accounting/Cashier
        1001 I Street, 21st Floor
        P.O. Box 806
        Sacramento, California  95812-0806

    A photocopy of all payment checks shall also be sent to the person designated by DTSC to receive submittals under this Order.

    6.18  <u>Severability</u>.  The requirements of this Order are severable, and Respondent shall comply with each and every provision hereof, notwithstanding the effectiveness of any other provision.

    6.19  <u>Incorporation of Plans, Schedules and Reports</u>.  All plans, schedules, reports, specifications and other documents that are submitted by Respondent pursuant to this Order are incorporated in this Order upon DTSC's approval or as modified pursuant to Section 6.7, DTSC Review and Approval, and shall be implemented by Respondent.  Any noncompliance with the documents incorporated in this Order shall be deemed a failure or refusal to comply with this Order.

    6.20  <u>Modifications</u>.  DTSC reserves the right to unilaterally modify this Order. Any modification to this Order shall be effective upon the date the modification is signed by DTSC and shall be deemed incorporated in this Order.

    6.21  <u>Time Periods</u>.  Unless otherwise specified, time periods begin from the effective date of this Order and "days" means calendar days.

    6.22  <u>Termination and Satisfaction</u>.  Except for Respondent's obligations under Sections 5.14 Operation and Maintenance (O&M), 5.15 Five-Year Review, 5.20 Financial Assurance, 6.12 Record Retention, and 6.17 Liability for Costs, Respondent's obligations under this Order shall terminate and be deemed satisfied upon Respondent's receipt of written notice from DTSC that Respondent has complied with all the terms of this Order.

18

6.23  <u>Parties Bound</u>.  This Order applies to and is binding upon Respondent, and its officers, directors, agents, employees, contractors, consultants, receivers, trustees, successors and assignees, including but not limited to, individuals, partners, and subsidiary and parent corporations. Respondent shall provide a copy of this Order to all contractors, subcontractors, laboratories, and consultants which are retained to conduct any work performed under this Order, within 15 days after the effective date of this Order or the date of retaining their services, whichever is later.  Respondent shall condition any such contracts upon satisfactory compliance with this Order. Notwithstanding the terms of any contract, Respondent is responsible for compliance with this Order and for ensuring that its subsidiaries, employees, contractors, consultants, subcontractors, agents and attorneys comply with this Order.

6.24  <u>Change in Ownership</u>.  No change in ownership or corporate or partnership status relating to the Site shall in any way alter Respondent's responsibility under this Order.  No conveyance of title, easement, or other interest in the Site, or a portion of the Site, shall affect Respondent's obligations under this Order.  Unless DTSC agrees that such obligations may be transferred to a third party, Respondent shall be responsible for and liable for any failure to carry out all activities required of Respondent by the terms and conditions of this Order, regardless of Respondent's use of employees, agents, contractors, or consultants to perform any such tasks.
Respondent shall provide a copy of this Order to any subsequent owners or successors before ownership rights or stock or assets in a corporate acquisition are transferred.

## VII. <u>EFFECTIVE DATE</u>

7.  The effective date of this Order shall be the date on which this Order is signed by the Department's authorized representative.

## VIII. <u>PENALTIES FOR NONCOMPLIANCE</u>

8.  Respondent may be liable for penalties of up to $25,000 for each day out of compliance with any term or condition set forth in this Order and for punitive damages up to three times the amount of any costs incurred by DTSC as a result of Respondent's failure to comply, pursuant to Health and Safety Code sections 25359, 25359.2, 25359.4, and 25367(c).  Health and Safety Code section 25359.4.5. provides that a responsible party who complies with this Order, or with another order or agreement concerning the same response actions required by this Order, may seek treble damages from a Respondent who fails or refuse to comply with this Order without sufficient cause.

IX.  <u>SIGNATORIES</u>

9.  Each undersigned representative of the parties to this Order certifies that he or she is fully authorized to enter into the terms and conditions of this Order and to execute and legally bind the Parties to this Order.

9.1  This Order may be executed and delivered in any number of counterparts, each of which when executed and delivered shall be deemed to be an original, but such counterparts shall together constitute one and the same document.

IT IS HEREBY AGREED AND ORDERED.


DATE: **3/23/2005**          **Original signed by**
                             Cheryl McLemore
                             Trustee of Dee M. McLemore Trust


DATE: **3/28/2005**          **Original signed by**
                             Barbara J. Cook, P.E., Chief
                             Northern California Coastal Cleanup Operations Branch
                             Department of Toxic Substances Control